PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PCS NITROGEN INCORPORATED,
successor through purchase, name
change and merger to Columbia
Nitrogen Corporation,
          *Defendant and Third Party*
                    *Plaintiff-Appellant,*

v.

ASHLEY II OF CHARLESTON LLC,
          *Plaintiff-Appellee,*

ROSS DEVELOPMENT CORPORATION; J
HOLCOMBE ENTERPRISES LP;
KONINKLIJKE DSM NV; DSM
CHEMICALS OF NORTH AMERICA
INCORPORATED; ROBIN HOOD
CONTAINER EXPRESS INCORPORATED;
ALL WASTE TANK CLEANING
INCORPORATED, f/k/a PSC Container
Services, LLC, now known as
QualaServices, LLC; J HENRY
FAIR, JR.,
  *Third Party Defendants-Appellees,*

          and

JAMES H. HOLCOMBE; CITY OF
CHARLESTON, SOUTH CAROLINA,
          *Third Party Defendants.*

No. 11-1662

Ross Development Corporation,
  *Third Party Defendant-Appellant,*

v.

PCS Nitrogen Incorporated,
successor through purchase, name
change and merger to Columbia
Nitrogen Corporation,
     *Defendant and Third Party
        Plaintiff-Appellee,*

and

Ashley II of Charleston LLC,
                          *Plaintiff,*

J Holcombe Enterprises LP;
Koninklijke DSM NV; Robin
Hood Container Express
Incorporated; DSM Chemicals of
North America Incorporated;
All Waste Tank Cleaning
Incorporated; J Henry Fair, Jr.;
City of Charleston, South
Carolina; James H. Holcombe,
          *Third Party Defendants,*

PSC Container Services LLC,
                      *Defendant.*

No. 11-2087

Robin Hood Container Express Incorporated,
  *Third Party Defendant-Appellant,*

v.

PCS Nitrogen Incorporated, successor through purchase, name change and merger to Columbia Nitrogen Corporation,
        *Defendant and Third Party Plaintiff-Appellee,*

Ashley II of Charleston LLC,
        *Plaintiff-Appellee,*

Ross Development Corporation; J Holcombe Enterprises LP; Koninklijke DSM NV; DSM Chemicals of North America Incorporated; All Waste Tank Cleaning Incorporated; J Henry Fair, Jr.,
  *Third Party Defendants-Appellees,*

and

City of Charleston, South Carolina; James H. Holcombe,
        *Third Party Defendants,*

PSC Container Services LLC,
        *Defendant.*

No. 11-2099

J Holcombe Enterprises LP;
J Henry Fair, Jr.,
            *Third Party
        Defendants-Appellants,*

                v.

PCS Nitrogen Incorporated,
successor through purchase, name
change and merger to Columbia
Nitrogen Corporation,
        *Defendant and Third Party
                Plaintiff-Appellee,*

Ashley II of Charleston LLC,
                *Plaintiff-Appellee,*

Robin Hood Container Express
Incorporated; Ross Development
Corporation; Koninklijke DSM
NV; DSM Chemicals of North
America Incorporated; All
Waste Tank Cleaning
Incorporated,
    *Third Party Defendants-Appellees,*
                and

City of Charleston, South
Carolina; James H. Holcombe,
            *Third Party Defendants,*

PSC Container Services LLC,
                *Defendant.*

No. 11-2104

ASHLEY II OF CHARLESTON LLC,
          *Plaintiff-Appellant,*

v.

PCS NITROGEN INCORPORATED,
successor through purchase, name
change and merger to Columbia
Nitrogen Corporation,
          *Defendant and Third Party
                  Plaintiff-Appellee,*

ROBIN HOOD CONTAINER EXPRESS
INCORPORATED; ROSS DEVELOPMENT
CORPORATION; KONINKLIJKE DSM
NV; DSM CHEMICALS OF NORTH
AMERICA INCORPORATED; ALL
WASTE TANK CLEANING
INCORPORATED; J HOLCOMBE
ENTERPRISES LP; J HENRY FAIR, JR.,
          *Third Party Defendants-Appellees,*

                and

CITY OF CHARLESTON, SOUTH
CAROLINA; JAMES H. HOLCOMBE,
          *Third Party Defendants,*

PSC CONTAINER SERVICES LLC,
                  *Defendant.*

No. 11-2297

Appeals from the United States District Court
for the District of South Carolina, at Charleston.
Margaret B. Seymour, Chief District Judge;
C. Weston Houck, Senior District Judge.
(2:05-cv-02782-MBS)

Argued: December 5, 2012

Decided: April 4, 2013

Before MOTZ, KING, and DIAZ, Circuit Judges.

---

Affirmed by published opinion. Judge Motz wrote the opinion, in which Judge King and Judge Diaz joined.

---

## COUNSEL

**ARGUED:** Brian J. Murray, JONES DAY, Chicago, Illinois, for PCS Nitrogen Incorporated. Thomas Nolen Barefoot, Bethesda, Maryland, for Ashley II of Charleston LLC; Capers Gamewell Barr, III, BARR, UNGER & MCINTOSH, Charleston, South Carolina, for J. Holcombe Enterprises LP and J. Henry Fair, Jr.; Daniel S. McQueeney, Jr., PRATT-THOMAS WALKER, PA, Charleston, South Carolina, for Ross Development Corporation; Timothy William Bouch, LEATH, BOUCH & CRAWFORD, LLP, Charleston, South Carolina, for Robin Hood Container Express, Incorporated; Lewis Bondurant Jones, KING & SPALDING, LLP, Atlanta, Georgia, for Koninklijke DSM NV and DSM Chemicals of North America, Incorporated. Jason Scott Luck, SEIBELS LAW FIRM, PA, Charleston, South Carolina, for Allwaste Tank Cleaning, Incorporated. **ON BRIEF:** John B. Williams, COZEN O'CONNOR, Washington, D.C.; Jennifer L. Swize, Craig I. Chosiad, JONES DAY, Washington, D.C., for PCS Nitrogen Incorporated. G. Trenholm Walker, PRATT-THOMAS WALKER, PA, Charleston, South Carolina; Thomas M. Shelley, III, ROGERS, TOWNSEND & THOMAS, PC, Columbia, South Carolina, for Ross Development Corporation. Amy E. Melvin, LEATH, BOUCH & SEEKINGS, LLP, Charleston, South Carolina, for Robin

Hood Container Express, Incorporated. Randall J. Butterfield, John L. Fortuna, KING & SPALDING LLP, Atlanta, Georgia, for Koninklijke DSM NV and DSM Chemicals of North America, Incorporated.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

These appeals arise from disputes as to liability for cleanup of hazardous substances at a former fertilizer manufacturing site in Charleston, South Carolina. After incurring response costs, Ashley II of Charleston, Inc., the current owner of a portion of the site, brought a cost recovery action against PCS Nitrogen, Inc., under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675 (2006). PCS counterclaimed and also brought third-party contribution actions against parties with past and current connections to the site. The district court bifurcated the case for trial. At the conclusion of the first bench trial, it found PCS a potentially responsible party jointly and severally liable for response costs at the site. At the conclusion of the second bench trial, the court found some of the other parties, including Ashley, potentially responsible parties, each liable for an allocated portion of the site's response costs. PCS, Ashley, and many of the other parties now appeal. For the reasons that follow, we affirm the judgment of the district court in all respects.

I.

A.

Congress enacted CERCLA in response to "the increasing environmental and health problems associated with inactive hazardous waste sites." *Nurad, Inc. v. William E. Hooper &*

*Sons Co.*, 966 F.2d 837, 841 (4th Cir. 1992). CERCLA "was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal quotation marks omitted).

In furtherance of these goals, CERCLA allows "private parties to recover the costs of cleaning up hazardous wastes from certain defined types of person." *Axel Johnson, Inc. v. Carroll Carolina Oil Co.*, 191 F.3d 409, 413 (4th Cir. 1999). A private-party plaintiff establishes a prima facie case for cost recovery under CERCLA by establishing that (1) the defendant is a potentially responsible person ("PRP"); (2) the site constitutes a "facility"; (3) a "release" or a threatened release of hazardous substances exists at the "facility"; (4) the plaintiff has incurred costs responding to the release or threatened release of hazardous substances ("response costs"); and (5) the response costs conform to the National Contingency Plan. 42 U.S.C. §§ 9601(9), (22), 9607(a); *see ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 120 F.3d 351, 356 (2d Cir. 1997).

Section 9607(a) establishes strict liability. *See United States v. Monsanto Co.*, 858 F.2d 160, 167 (4th Cir. 1988). This liability under CERCLA is subject only to a few narrow defenses and exemptions. *See* 42 U.S.C. § 9607(b) (defenses); *id.* § 9607(o)-(r) (exemptions). Liability is, by default, joint and several. *See Monsanto*, 858 F.2d at 171-72.

However, in some circumstances a PRP may mitigate the sting of CERCLA's imposition of joint and several liability by apportionment or allocation of harm. *See Axel Johnson*, 191 F.3d at 413. Apportionment—also known as division of damages—assigns a several share of liability to each PRP based on "traditional and evolving principles of federal common law." *Monsanto*, 858 F.2d at 171-72. Under these principles, apportionment is available only when a PRP proves that "there is a reasonable basis for determining the contribution

of each cause to a single harm." *Burlington Northern*, 556 U.S. at 614 (quoting *Restatement (Second) of Torts* § 433A(1)(b) (1963-64)).

In contrast, allocation of harm—also known as contribution—is available to any party sued under § 9607(a), and allows the party to "seek contribution from any other person who is liable or potentially liable under [§] 9607(a)." 42 U.S.C. § 9613(f). The district court may then allocate several liability for "response costs among liable parties using such equitable factors as the court determines are appropriate." *Id.*; *see Minyard Enters., Inc. v. Se. Chem. & Solvent Co.*, 184 F.3d 373, 385 (4th Cir. 1999).[1]

## B.

Central to this CERCLA case is the history of the site at issue here—approximately forty-three acres located in Charleston, South Carolina. As a result of decades of phosphate fertilizer production, the westernmost thirty-four acres

---

[1] In addition to the fact that apportionment rests on causation principles and allocation rests on equity principles, the two also differ in function. Although both technically negate CERCLA's joint liability by assigning shares of liability, *see Minyard Enters.*, 184 F.3d at 385; *Monsanto*, 858 F.2d at 171-72, they differ in how they determine liability for so-called "orphaned" shares—those shares of "liability attributable to a party who is insolvent, cannot be located, or cannot be identified," *Lyondell Chem. Co. v. Occidental Chem. Corp.*, 608 F.3d 284, 303 (5th Cir. 2010). If a court apportions harm, the party that incurred the response costs bears the burden of orphaned shares because the apportioned orphan share is necessarily unrecoverable. *See Burlington Northern*, 556 U.S. at 605, 618-19 (upholding apportionment that left over ninety percent of the harm as an orphaned share ultimately borne by the government). But when a court allocates shares it retains the equitable discretion to allocate orphaned shares (or re-allocate newly orphaned shares) to solvent, available PRPs, thus shifting the burden of orphaned shares from the party that incurs the response costs. *See Lyondell Chem. Co.*, 608 F.3d at 303; *Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1303 (9th Cir. 1997), *overruling on other grounds recognized by Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924, 927 (9th Cir. 2008).

of the site require remediation of soils contaminated with arsenic, lead, and other hazardous substances. The evidence presented at the two bench trials established the following facts.

1.

From 1884 to the early 1900s, seven phosphate fertilizer plants operated in close proximity to the site and provided potential sources for pyrite waste that may have been disposed of on the site prior to 1906.

Planters Fertilizer & Phosphate Company, now known as Ross Development Corporation, purchased the site in 1906. Planters manufactured phosphate fertilizer at the site by reacting sulfuric acid with phosphate rock. Planters produced the sulfuric acid for the process on-site, and stored the acid in lead-lined tanks. Prior to the 1930s, Planters used pyrite ore as the primary fuel for its sulfuric acid production. The burning of pyrite ore generated a pyrite slag byproduct containing high concentrations of arsenic and lead. Planters spread the slag byproduct to stabilize roads on the site. This accounts for the vast majority of arsenic and lead contamination found on the site today.

Planters continued operating its fertilizer production plant on the site until 1966. During that time, Planters constructed and repaired several minor buildings and, after a fire destroyed a significant portion of its original acid plant, constructed a modernized acid plant. On June 30, 1966, Planters sold the site—including the plant and its equipment—to Columbia Nitrogen Corporation ("Old CNC").

Old CNC continued operations of the acid and fertilizer plants until 1970 and 1972, respectively. Although Old CNC did not use pyrite ore, its superphosphate fertilizer production generated dust that contained elevated levels of arsenic and lead, and contributed to arsenic and lead soil contamination

on the site. During its operations, Old CNC constructed a new granulation plant and converted the former granulation plant into storage.

In April 1971, a wind storm extensively damaged many buildings on the site, including the acid plant, and dispersed contaminated materials across the site. Old CNC chose not to repair, and instead demolished, the damaged acid plant. In the process, Old CNC disturbed the subsurface soil to a depth of at least two feet. By October 1972, Old CNC had ceased all fertilizer production on the site.

The site remained inactive until 1977, when Old CNC began to dismantle the remaining structures, a process completed in January 1981. All told, Old CNC's construction and demolition activities between 1971 and 1981 affected nearly eighty percent of the area of contaminated soils that needs to be remediated as part of the site's cleanup. In May 1985, Old CNC sold the site to James H. Holcombe and J. Henry Fair (collectively "Holcombe and Fair"[2]). But in doing so, Old CNC apparently did not transfer any of its corporate liabilities for past actions on the site; thus, as the parties agree, Old CNC—if still in existence—would be a PRP with respect to the site. *See infra* § II.A.

2.

Old CNC did not limit its fertilizer production to the site. Rather, while owning the site, Old CNC also owned and operated an ammonia and nitrogen fertilizer plant in Augusta, Georgia. In 1986, over a year after Old CNC had sold its

---

[2]Holcombe formed Holcombe Enterprises, Inc., on December 17, 1997 and conveyed his share of the site to Holcombe Enterprises six days later. Holcombe, Fair, and Holcombe Enterprises are all parties to this appeal, and were treated as one entity by the district court. For the sake of simplicity, we identify the owners of the site as Holcombe and Fair both before and after Holcombe's conveyance of his share of the property to Holcombe Enterprises.

Charleston site, Old CNC's parent corporations, Koninklijke DSM N.V. and DSM Chemicals North America (collectively "DSM Parties"), decided to shut down Old CNC to benefit from a $100 million tax advantage in the Netherlands. To do so, Old CNC sought a buyer for certain "Assets" and its "Acquired Business," including its Augusta plant and operation. Andlinger & Company, Inc., a firm specializing in the acquisition of businesses, incorporated CNC Corp. ("New CNC") to purchase Old CNC's "Assets" and "Acquired Business."

Old CNC and New CNC entered into a series of agreements, and the acquisition closed on November 6, 1986. Under the Acquisition Agreement, New CNC purchased certain "Assets" and the "Acquired Business" for $50 million, an approximately sixty percent discount from book value. In exchange for an additional $5 million discount, New CNC accepted the acquired business and assets "as is." After closing, New CNC immediately changed its name to "Columbia Nitrogen Corporation" –- the same name under which Old CNC operated. At the same time, Old CNC initiated the process of liquidation and dissolution.

After the acquisition, New CNC continued producing ammonia- and nitrogen-based fertilizers at the Augusta plant. By virtue of a series of mergers and acquisitions, PCS Nitrogen, Inc., is a successor to New CNC. Neither New CNC nor PCS ever owned or operated any portion of the Charleston site at issue in this appeal.

3.

Meanwhile, Holcombe and Fair, who had acquired the Charleston site from Old CNC in 1985, were unaware of any contamination at the site. They first became aware of the presence of hazardous substances at the site in 1990.

Holcombe and Fair intended to subdivide and lease the site, and the record contains no evidence that Holcombe and Fair

introduced any new hazardous substances to the site. However, even after learning of the possibility (and ultimate existence) of hazardous substances on the site, Holcombe and Fair undertook site-wide earth-moving activities, including the construction of a street extension, the addition of water and sewer lines, excavation and grading, and the construction of several detention ponds. As late as 1998, Holcombe and Fair undertook earth-moving activities in areas with "discolored" and "contaminated" soils, and destroyed on-site wetlands along the Ashley River. However, they also added a four-to-six inch limestone run of crusher cover over the majority of the site, which mitigated risks of acute exposure to the site's contaminated soils.

During their ownership, Holcombe and Fair subdivided and conveyed several parcels from the original site. First, in December 1987, Holcombe and Fair sold three acres of the site to Max and Marlene Mast. The Masts sold their parcel to Allwaste Tank Cleaning, Inc., in August 1988. Allwaste operated a shipping container cleaning and storage business and in 1991 leased two additional acres from Holcombe and Fair for storage. As part of its operations, Allwaste utilized an underground sump system to capture wastewater generated by the container-cleaning process and pump it into a treatment system. Allwaste allowed the sumps to deteriorate during its ownership of the parcel to the extent that the sumps presented a threat of a release of hazardous substances. Although Allwaste did not introduce arsenic or lead to its parcel, both contaminate the soils in its parcel. Allwaste still owned the parcel at the commencement of this action.

In December 1990, Holcombe and Fair contracted to sell two acres of the site to Robin Hood Container Express ("RHCE"). In December 1991, RHCE directed and paid for the excavation of a 1380-cubic-foot pond, two asphalt driveways, and extended sewer and water lines on the site. Contractors for RHCE also stripped six inches of topsoil and graded and proof-rolled the land. A month later, Holcombe

and Fair conveyed the two-acre parcel to RHCE's president, Robin Hood, who leased it to RHCE to operate a dropyard. During its tenure, RHCE filled in the pond, and limestone run of crusher now covers the entire parcel. Although RHCE did not introduce any arsenic or lead to its leasehold, both contaminate its leasehold's soil. Robin Hood continued to own, and RHCE continued to lease, this parcel at the commencement of this action.

In December 1991, Holcombe and Fair conveyed the street extension they had constructed, totaling 1.28 acres, to the City of Charleston by quitclaim deed. The City remains the owner of the street extension today.

Finally, in November 2003, Holcombe and Fair sold their remaining 27.62 acres of the site to Ashley II of Charleston, Inc., for $2.7 million. Ashley purchased the site to include it as a portion of its Magnolia Development—a sustainable, mixed-use project. As with other parcels within the project, Ashley purchased the site with knowledge of, and the intent to remediate, the contaminated soils.

By the time of Ashley's ownership, the run of crusher cover had degraded, leaving contaminated soil exposed in many areas. For several years, Ashley allowed a trash pile to accumulate on its parcel.

In February 2007—well after the commencement of this action—Ashley contracted with Allwaste to purchase Allwaste's three-acre parcel. Ashley engaged in extensive prepurchase environmental assessments of the parcel, and Allwaste conveyed the parcel to Ashley in May 2008.

In investigating and remediating the site, Ashley to date has incurred response costs totaling at least $194,000.[3]

---

[3]Since 1998, state and federal experts have comprehensively investigated environmental conditions at the site, and have documented arsenic-

## C.

On September, 26, 2005, Ashley filed this action, seeking a declaratory judgment that PCS was jointly and severally liable for response costs as a PRP for the site, and recovery of response costs already incurred. *See* 42 U.S.C. § 9607(a)(4)(B). Ashley contended that PCS was a successor corporation to Old CNC, and thus liable as a PRP in Old CNC's stead.

PCS denied liability as a successor corporation to Old CNC, and in the alternative filed a contribution counterclaim under 42 U.S.C. § 9613(f) against Ashley and third-party claims against Ross, the DSM Parties, Holcombe and Fair, Allwaste, RHCE, and the City of Charleston. Those parties in turn filed counter- and cross-claims against one another under § 9613(f), and also sought determination of their rights to future cost recovery and contribution.

The district court bifurcated the proceedings. The first trial would determine if PCS was liable to Ashley under § 9607(a). If so, the second trial would allocate the ultimate responsibility of each party for response costs at the site under § 9613(f).

On September 28, 2007, after a bench trial on PCS's liability, the court held that PCS was a corporate successor to Old CNC, and thus jointly and severally liable to Ashley for response costs as a PRP for the site. A year later, the presiding

---

and lead-contaminated soils and low soil pH conditions across the site, as well as two carcinogenic polycyclic aromatic hydrocarbon "hotspots." Although EPA considered undertaking removal actions during Holcombe and Fair's ownership of the site, it did not do so. After Ashley purchased the site, it asked EPA to notify it if the agency desired "specific cooperation, assistance, access or the undertaking of any reasonable steps with respect to the Site." In October 2005, EPA determined that the site qualified for a non-time-critical removal action and described its preferred removal alternatives. To date, however, EPA has not ordered Ashley to take any remedial actions on the site.

judge disqualified himself from further participation in the case, and the case was reassigned to another judge. On June 2, 2009, the successor judge denied PCS's motion to vacate the original judge's order as to PCS's liability. Shortly thereafter, the court granted summary judgment to the DSM Parties, holding them not liable because "no basis existed" for imputing Old CNC's acts to them.

Then, between October 2009 and January 2010, the district court held a sixteen-day bench trial on the allocation phase. The court ultimately allocated liability for past and future response costs at the site to PCS, Ashley, Ross, Holcombe and Fair, RHCE, and Allwaste in various amounts.

These appeals followed. On appeal, no party disputes that Ashley incurred response costs for the cleanup of hazardous substances at the site that were consistent with the National Contingency Plan. Rather, the parties solely dispute whether and to what amount each is liable for response costs at the site.

## II.

We first address the appeals of the district court's determinations as to which parties constitute PRPs for the site.

CERCLA defines four non-mutually exclusive classes of PRPs liable for costs incurred in responding to a "release" of hazardous substances at any "facility." 42 U.S.C. § 9607(a); *see Nurad*, 966 F.2d at 841. These PRPs include (1) the current "owner" or "operator" of a "facility"; (2) any "person" who "owned" or "operated" the "facility" at the time of disposal of a hazardous substance; (3) any "person" who "arranged for disposal or treatment" of hazardous substances at the "facility"; and (4) any "person" who accepts hazardous substances "for transport to disposal or treatment facilities, incineration vessels or sites." 42 U.S.C. § 9607(a)(1)-(4); *Nurad*, 966 F.2d at 841. The classes of PRPs have an undeni-

ably broad reach. *See United States v. Atl. Research Corp.*, 551 U.S. 128, 136 (2007). But they nonetheless remain subject to the limitations of derivative liability inherent in corporate law. *See United States v. Bestfoods*, 524 U.S. 51, 62-64 (1998).

A PRP's strict liability for response costs is subject only to CERCLA's limited defenses and exemptions. *Axel Johnson*, 191 F.3d at 413. Courts do not consider equity in determining whether a party is a PRP. Congress, however, did provide for equitable allocation of liability under § 9613(f) to mitigate any inequity arising from CERCLA's strict liability scheme. *Id.* at 415.

With these principles in mind, we review the district court's determinations of PRP status de novo. *See Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R. Co.*, 142 F.3d 769, 773 (4th Cir. 1998). We first consider PCS's appeal of the determination that it is a PRP. Then, we turn to the multiple challenges to the determinations of the other parties' PRP status in the second trial.

A.

The district court held that PCS is a PRP for the Charleston site as the corporate successor to Old CNC. Although PCS never owned or operated the site, it admits that it is a successor to New CNC, and that Old CNC—despite dissolving decades ago—would be a PRP.

Under CERCLA, successor corporations may be liable for the actions of their predecessors. *United States v. Carolina Transformer Co.*, 978 F.2d 832, 837 (4th Cir. 1992). However, as at common law, a corporation that acquires the assets of another corporation typically does not acquire its liabilities, unless "(1) the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) the transaction may be considered a de facto merger; (3) the successor may

be considered a 'mere continuation' of the predecessor; or (4) the transaction is fraudulent." *Id.* at 838. In the past, we have also recognized successor liability where "substantial continuity" exists between a predecessor and successor corporation. *Id.*

The district court held PCS liable as a successor to Old CNC under three theories. We need only address one—that New CNC either unambiguously, or based on extrinsic evidence, assumed Old CNC's liabilities for the site under the 1986 Acquisition Agreement. In doing so, we review the district court's applications of contract principles de novo, and its findings of fact with respect to extrinsic evidence for clear error. *Hendricks v. Cent. Reserve Life Ins. Co.*, 39 F.3d 507, 512-13 (4th Cir. 1994). Under the Acquisition Agreement's choice of law provision, we apply New York contract law.

New York law enforces unambiguous contracts in accordance with their plain terms. *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). In determining whether a contract is ambiguous, a court must

> examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance, and a sensible meaning of words should be sought.

*William C. Atwater & Co. v. Panama R.R. Co.*, 159 N.E. 418, 419 (N.Y. 1927). Thus, when considering isolated, potentially conflicting provisions, so long as a contract "makes clear the parties' over-all intention," a court "should then choose that construction which will carry out the plain purpose and object of the [agreement]." *Kass v. Kass*, 696 N.E.2d 174, 181 (N.Y. 1998) (internal quotation marks omitted). In harmonizing pro-

visions, however, "no provision of a contract should be left without force and effect." *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956).

1.

Applying these principles, the district court initially held, as Ashley maintained, that New CNC unambiguously assumed Old CNC's CERCLA liabilities for the Charleston site under the Acquisition Agreement. We cannot agree.

Section 3.4 of the Agreement, on which the district court relied, does unambiguously transfer "[a]ll obligations required to be performed under all court, administrative and regulatory orders." But § 3.4 does not address, let alone unambiguously provide, that it covers CERCLA "obligations" arising *after* execution of the Agreement.

Ashley alternatively argues that New CNC unambiguously assumed Old CNC's CERCLA liability for the site in § 3.6 of the Agreement. This argument fares no better. All parties recognize that under § 3.6 New CNC did assume unknown, future CERCLA liability. The liability assumed, however, was only that "arising out of or in connection with the Acquired Business or the Purchased Assets."

It is undisputed that the phrase "arising out of or in connection with" would transfer liabilities from businesses or assets no longer owned by a seller in a *stock* sale. But typically this phrase does not transfer such liabilities in an *asset* sale. *See Honeywell Int'l, Inc. v. Phillips Petroleum Co.*, 415 F.3d 429, 435-36 (5th Cir. 2005). The Acquisition Agreement does not clearly establish whether the parties intended an ordinary asset sale or an atypical asset sale that was to be treated as a stock sale. Rather, the Agreement ambiguously provides that New CNC "assume[s] all obligations and liabilities relating to the Acquired Business . . . *as if* [Old CNC] were to sell and [New CNC] *were to purchase the stock* of [Old CNC] on the

open market." This ambiguity prevents us from concluding that under the Agreement New CNC unambiguously assumed Old CNC's CERCLA liabilities for the Charleston site.

This ambiguity also defeats PCS's contention that the Acquisition Agreement clearly provides that New CNC did not assume Old CNC's CERCLA liabilities for the site. For PCS can point to no language in the Agreement which clarifies that, even if this were an atypical stock-like asset sale, New CNC assumed no CERCLA liabilities for the site.

At its outset, § III of the Agreement does, as PCS contends, limit the transfer of liabilities and obligations to New CNC to those "*relating to* the Acquired Business and Purchased Assets." But PCS's heavy reliance on the narrowness of this "relating to" language at the beginning of § III ignores language at the end of that same section that provides that transferred liabilities include "*without limitation*, the liabilities and obligations described below" in §§ 3.1-3.7. Among the liabilities "described below" are those in § 3.4, which provides that New CNC will assume not only the certain obligations "relating to the Acquired Business and Purchased Assets" but also those "*applicable to the Seller*." Where a general provision like that at the outset of § III conflicts with a specific provision like that in § 3.4, "the specific provision controls." *Muzak Corp.*, 133 N.E.2d at 690.

Therefore, we cannot accept either party's arguments that the Agreement unambiguously determines whether New CNC assumed Old CNC's CERCLA liability for the site.

2.

Usually, when we conclude that a district court has erred in holding a contract unambiguous, we must remand for a factual determination of the parties' intent based on consideration of extrinsic evidence. *See, e.g.*, *Atalla v. Abdul-Baki*, 976 F.2d 189, 195 (4th Cir. 1992). However, in this case, the

district court has already analyzed the extrinsic evidence offered by the parties during the bench trial, and alternatively found based on that evidence that New CNC intended to and did acquire CERCLA liabilities for the site under the Acquisition Agreement. We review a district court's factual finding as to intent for clear error. *See Hendricks*, 39 F.3d at 512. We can reverse only if, after reviewing the entire record, we are "left with the definite and firm conviction that a mistake has been committed." *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (internal quotation marks omitted). This rigorous standard does not permit reversal here.

The district court based its ultimate factual finding that extrinsic evidence established that New CNC intended to assume CERCLA liability for the Charleston site on several predicate findings. When considering ambiguity, the court initially found that even if the "as if" clause in the Agreement did not evince the parties' intent to enter into something very akin to a stock sale, at the very least the clause was ambiguous. Thus, the court considered the extrinsic evidence and found it demonstrated that the parties did intend to enter into an agreement "tantamount to a stock sale," *i.e.*, "as if" meant "equivalent to."

In support of this critical finding, the district relied on the abundant extrinsic evidence that New CNC knew of Old CNC's determination to dissolve by December 31, 1986, to preserve the $100 million tax advantage. The court found that New CNC's knowledge of Old CNC's paramount aim to avail itself of this tax advantage supported Ashley's contention that the parties—Old CNC and New CNC—agreed that New CNC would acquire "*all* of Old CNC that was not specifically retained or sold to another entity." Given that no one contends that Old CNC's CERCLA liability for the Charleston site was "specifically retained or sold to another entity," the court found this evidence supported Ashley's position that Old CNC transferred this liability to New CNC.

The district court also pointed to the extrinsic evidence that Old CNC discounted its sale price of $50 million by sixty percent from book value, and discounted an additional $5 million from the sale price in exchange for New CNC's assumption of the business and assets "as is," *i.e.*, including unknown environmental liabilities. The court noted that New CNC's lawyer on the transaction testified that the principals at New CNC were "comfortable enough with [their] due diligence to conclude that any unknown liabilities would not exceed $5 million." (To date, of course, the CERCLA cleanup costs for the site ($194,000) do not approach that number.) The court concluded that the heavily discounted purchase price further reduced by the $5 million discount for acceptance "as is" constituted additional extrinsic evidence that New CNC acquired "all of Old CNC that was not specifically retained or sold to another entity," *i.e.*, New CNC acquired CERCLA liability for the Charleston site.

Finally, the court found that New CNC intended to acquire "substantially all" of Old CNC—including its environmental liabilities—evidenced by two other agreements that New CNC entered into at the same time as the Acquisition Agreement. One of these agreements governed future advances, and the other contained guarantees signed by the chairman of New CNC. In both, New CNC stated that it was purchasing "substantially all" of Old CNC's liabilities. The court noted that these contemporaneous statements by New CNC "contradict[ed]" its after-the-fact litigation position as to the limited nature of the liabilities acquired.

Based on these facts, the court found that the parties intended to and in the Acquisition Agreement did transfer all of Old CNC's assets and liabilities not explicitly retained or sold to another entity, including Old CNC's latent CERCLA liabilities for the site.

PCS maintains that the district court clearly erred in so finding. PCS first contends that, contrary to the district court's

conclusions, Old CNC's foremost intent to dissolve for tax benefit purposes and its agreement to discount its price if New CNC assumed the assets "as is" are "irrelevant" as to the actual scope of the liabilities transferred. That characterization seems to us to be an overstatement. While these facts are not dispositive, the district court could certainly find them relevant. PCS also points to evidence that after the sale Old CNC never transferred to New CNC records relating to the site (including those regarding environmental contamination); that New CNC was so cautious about assuming environmental liabilities that it did not acquire the land underlying the Augusta plant; and that some of the parties involved in the transaction testified that New CNC only intended to acquire the Augusta plant and operations. Although these facts are helpful to PCS's position, none *require* a finding in its favor.

Finally, PCS contends that, although Recital B describes the Agreement "as if" it were a stock sale, at the time the Agreement was executed witnesses at trial "agreed" that the sale transferred *only* assets. If the undisputed evidence at trial had established such contemporaneous "agreement" between Old CNC and New CNC, then PCS might well have been entitled to judgment. But the trial evidence did not establish this "agreement." In fact, only PCS's witnesses "agreed" on this point, and the district court was free to weigh their testimony against the contrary, above-outlined evidence offered by Ashley.

This is not to say PCS did not present evidence from which the district court could have resolved the Agreement's ambiguity in its favor. But Ashley presented contrary evidence supporting its view as to the meaning of the ambiguous contract language, and the district court, as fact finder, found in favor of Ashley. We cannot conclude that the court clearly erred in doing so. Here, as in many other cases, "both the intrinsic and extrinsic evidence of intended reach of the agreement might have supported a contrary finding." *See Brown v. Balt. & Ohio R.R. Co.*, 805 F.2d 1133, 1140 (4th Cir. 1986).

But we are not "left with the definite and firm conviction that a mistake has been committed." *Easley*, 532 U.S. at 242 (internal quotation marks omitted). Accordingly, we must affirm the judgment of the district court holding that in the Agreement New CNC assumed Old CNC's CERCLA liabilities for the site and that PCS is therefore a PRP as a successor to Old CNC's CERCLA liability for the site.[4]

B.

Next, we turn to the appeals of other parties challenging the district court's determinations that they too constituted PRPs. As the plaintiff in the allocation action under 42 U.S.C. § 9613(f), PCS bore the burden of proving that another party was a PRP under § 9607(a). *See Minyard Enters.*, 184 F.3d at 385. We consider each defendant's challenge to PRP status in turn, reviewing the district court's ultimate determinations of PRP status de novo, and its factual findings underlying those determinations for clear error.

1.

The district court held that Holcombe and Fair are PRPs as owners of the site at the time of disposal. *See* 42 U.S.C. § 9607(a)(2). The court based its holding on its factual finding that Holcombe and Fair's earth-moving and construction

---

[4]For the reasons well stated by the successor judge in her written opinion, we reject PCS's contention that we should vacate the judgment of her predecessor to remedy that court's asserted violation of 28 U.S.C. § 445(a). We also reject PCS's contention that the district court erred in granting summary judgment to the DSM Parties on PCS's contribution claims for alleged derivative CERCLA liability for the acts of Old CNC. Before the district court, PCS merely argued that veil-piercing and single business enterprise theories rendered the DSM Parties liable. The district court rejected both contentions. On appeal, PCS contends that the "amalgamation" theory renders the DSM Parties liable. *See, e.g.*, *Kincaid v. Landing Dev. Corp.*, 344 S.E.2d 869, 874 (S.C. Ct. App. 1986). PCS waived this argument by failing to raise it before the district court. *See Holland v. Big River Minerals Corp.*, 181 F.3d 597, 605 (4th Cir. 1999).

activities redistributed already-contaminated soils, causing a disposal of hazardous substances on the site.

Holcombe and Fair do not challenge the legal basis for the district court's conclusion. Indeed, Holcombe and Fair accept that past owners or operators of a facility are liable for "secondary disposals"—that is, the movement or dispersal of already-once-disposed hazardous substances through earth-moving or construction activities—that occur during their ownership or operation of the facility. *See Tanglewood E. Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1573 (5th Cir. 1988) ("[CERCLA's] definition of disposal does not limit disposal to a one-time occurrence—there may be other disposals when hazardous materials are moved, dispersed, or released during landfill excavations and fillings."); *see also Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1510 (11th Cir. 1996) (same); *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1342-43 (9th Cir. 1992) (same); *cf. Westfarm Assocs. Ltd. P'ship v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 680-81 (4th Cir. 1995) (refusing to limit "multiple release" disposals to non-migrating hazardous materials); *Nurad*, 966 F.2d at 844-46 (interpreting "disposal" broadly to include passive acts, such as leaking or spilling).

Instead, Holcombe and Fair challenge the district court's finding that a secondary disposal actually occurred during their ownership of the site. Holcombe and Fair argue that the court clearly erred because PCS offered no "discrete proof" that Holcombe and Fair actually moved or dispersed contaminated soils during their earth-moving activities. At best, Holcombe and Fair contend, the evidence demonstrates only that a disposal "probably" occurred during their ownership of the site.

To be sure, PCS presented no *direct* evidence that Holcombe and Fair moved or dispersed any contaminated soils. However, "CERCLA does not require a smoking gun." *Niag-*

*ara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 136 (2d Cir. 2010). Instead, "CERCLA liability may be inferred from the totality of the circumstances [and] need not be proven by direct evidence." *Tosco Corp. v. Koch Indus., Inc.*, 216 F.3d 886, 892 (10th Cir. 2000); *see also Franklin Cnty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 547 (6th Cir. 2001).[5] Thus, as with any other factual finding, we are bound to affirm any inference of CERCLA liability if "plausible in light of the record viewed in its entirety." *See Davis v. Richmond, Fredericksburg & Potomac R.R. Co.*, 803 F.2d 1322, 1327 (4th Cir. 1986) (internal quotation marks omitted).

The district court heard evidence showing that Holcombe and Fair engaged in extensive grading and construction that affected at least 27.9% of the site during their ownership, and that even superficial earth-moving activities such as grading can redistribute contaminated soils. Considering the evidence of widespread contamination across the site, the court's inference that Holcombe and Fair's construction activities at some point effected a disposal is certainly plausible.

Accordingly, we affirm both the court's finding that a disposal occurred during Holcombe and Fair's ownership of the site, and its holding that Holcombe and Fair are therefore PRPs for the site under 42 U.S.C. § 9607(a)(2).

---

[5]Holcombe and Fair rely on *Redwing Carriers* for their contention that a district court needs "discrete proof" to find that a secondary disposal occurred. But in *Redwing Carriers* the Eleventh Circuit merely held that "the only reasonable inference" from the evidence presented did not include disposal, "[n]o matter how broadly the term is defined." 94 F.3d at 1510-12. The court did not require "direct evidence" of movement or dispersal of contaminated soil, but just evidence that would support such an inference. Such evidence was absent in *Redwing Carriers*, but is present here.

2.

The district court held that RHCE is a PRP for the site as a current operator. *See* 42 U.S.C. § 9607(a)(1). On appeal, RHCE concedes that it is a current operator,[6] but challenges its PRP status on several grounds—all unavailing.

Most fundamentally, RHCE argues that its leasehold is not "part of the property for which Ashley sued PCS to remediate." RHCE Br. at 1, 25. This argument misunderstands CERCLA. Whether RHCE's leasehold is "part of the property for which Ashley sued PCS to remediate" is simply irrelevant. The relevant question is whether RHCE's leasehold is part of a "facility" as defined by CERCLA. *See, e.g.*, 42 U.S.C. § 9607(a)(1) (making liable "the owner and operator of a . . . facility").

CERCLA defines "facility" to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." *Id.* § 9601(9). The definition is not predicated, as RHCE seems to believe, on the area targeted for remediation. Instead, the statutory definition indicates "that the bounds of a facility should be defined at least in part by the bounds of the contamination." *United States v. Twp. of Brighton*, 153 F.3d 307, 313 (6th Cir. 1998); *see Nurad*, 966 F.2d at 842-43 (holding a "facility" includes that portion of a larger property "in and around the [leaking] storage tanks"). The district court did not err in finding on the basis of the evidence before it that RHCE's leasehold is contaminated as part of a pattern of widespread contamination across the entire site. That is, RHCE's parcel is part of the contaminated "facility" for CERCLA's purposes.

---

[6]The district court also held that RHCE was a PRP as an operator at the time of disposal under § 9607(a)(2), a holding that RHCE contends constitutes clear error. We need not reach that question because RHCE does not challenge on appeal the court's alternative holding that RHCE is a current operator.

RHCE's seeming suggestion that its leasehold—even though contaminated—should be considered separately from the rest of the site also fails. "Courts have uniformly refused to divide widely contaminated properties . . . into separate facilities in response to a party's claim to be responsible for contamination in only certain parts of the property." *Axel Johnson*, 191 F.3d at 418; *see also United States v. Capital Tax Corp.*, 545 F.3d 525, 535 (7th Cir. 2008) ("The boundaries of [a] facility do not necessarily reflect property boundaries, and liability can extend beyond what . . . defendants actually own." (internal citation omitted)).

In this case, fertilizer production and construction activities widely contaminated the site, including the area of RHCE's leasehold. That the leasehold is less contaminated than some of the rest of the site and would not require remediation for its current industrial use makes no difference for purposes of determining PRP status under CERCLA. This is so because the hazardous substances located on RHCE's leasehold are not distinct from those on the rest of the site. Otherwise, an operator of a less-contaminated leasehold, like RHCE's, in a multiple-parcel facility could always avoid liability for CERCLA response costs for the rest of the facility merely by demonstrating less pollution-sensitive land use on its leasehold. This would turn § 9607(a)'s strict liability on its head, and would improperly broaden Congress' specific exemption from liability for "innocent" contiguous landowners. *See* 42 U.S.C. § 9607(q).[7]

---

[7]RHCE's argument that its leasehold cannot be a part of the "facility" because EPA has neither defined the bounds of the facility nor approved a final remediation plan for the site is similarly meritless. CERCLA does not require EPA to have defined an area as a "facility" in order for a private party to bring a recovery action. *See* 42 U.S.C. §§ 9601(9), 9607(a). And "governmental approval is not a prerequisite to private recovery for cleanup costs." *Richland-Lexington Airport Dist. v. Atlas Props., Inc.*, 901 F.2d 1206, 1208-09 (4th Cir. 1990).

Finally, although RHCE does not claim that it meets the rigorous qualifications necessary to be exempt from PRP status as an innocent *contiguous* landowner under § 9607(q), it does assert a defense from liability as an innocent landowner under § 9607(b)(3). This defense requires a party otherwise liable as a PRP to prove "by a preponderance of the evidence: (1) that another party was the 'sole cause' of the release of hazardous substances and the damages caused thereby; (2) that the other, responsible party did not cause the release in connection with a contractual, employment, or agency relationship with the defendant; *and* (3) that the defendant exercised due care and guarded against the foreseeable acts or omissions of the responsible party." *Westfarm Assocs. Ltd. P'ship*, 66 F.3d at 682. The district court rejected RHCE's assertion of this defense, holding that it failed on all three prongs. On appeal, RHCE only challenges the court's holdings under the first and third prongs of the defense. Because a party must establish all three prongs of the defense, and RHCE does not challenge the court's determination that it failed the second prong, we must affirm the court's denial of RHCE's innocent landowner defense.

In short, because RHCE is a current operator of a leasehold that is part of the facility at the site, we affirm the district court's determination that RHCE is a PRP for the site as a current operator under 42 U.S.C. § 9607(a)(1).

3.

The district court also held Ashley to be a PRP for the site as a current owner. *See* 42 U.S.C. § 9607(a)(1). In doing so, the court rejected Ashley's attempt to establish a bona fide prospective purchaser ("BFPP") exemption from liability. *See id.* §§ 9601(40), 9607(r)(1). On appeal, Ashley again invokes the BFPP exemption.

In 2002, Congress enacted the BFPP exemption as one in an array of CERCLA amendments intended "to promote the

cleanup and reuse of brownfields" under the Small Business Liability Relief and Brownfields Revitalization Act ("Brownfields Act"), Pub. L. No. 107-118, 115 Stat. 2356 (2002). BFPP status exempts from CERCLA liability a party otherwise liable simply because it is "considered to be an owner or operator of a facility" under 42 U.S.C. § 9607(a)(1). *See* 42 U.S.C. § 9607(r)(1). To qualify for the exemption, a current owner or operator of a facility must have acquired the facility after January 11, 2002, must "not impede the performance of a response action or natural resource restoration" at the facility, and must establish eight criteria by a preponderance of the evidence. *See id.* §§ 9601(40)(A)-(H), 9607(r)(1).

The district court held that Ashley failed to establish a number of these eight criteria. Among them is the requirement that a current owner "exercises appropriate care with respect to hazardous substances found at the facility by taking reasonable steps to (i) stop any continuing release; (ii) prevent any threatened future release; and (iii) prevent or limit human, environmental, or natural resource exposure to any previously released hazardous substance." *Id.* § 9601(40)(D). The court specifically found that Ashley failed to clean out and fill in sumps that should have been capped, filled, or removed when related aboveground structures were demolished, and that Ashley did not monitor and adequately address conditions relating to a debris pile and the limestone run of crusher cover on the site. The court concluded that these inactions established that Ashley did not exercise appropriate care at the site.

Ashley argues that the purposes of the Brownfields Act necessitate that courts apply a less-stringent standard of "appropriate care" and "reasonable steps" than that applied by the district court. Otherwise, Ashley maintains, landowners will not undertake voluntary brownfields redevelopment for fear of becoming fully liable for cleanup costs as a result of minor mistakes that may not even contribute to harm at the facility. Even recognizing Congress' clear intent to promote voluntary

brownfields redevelopment in passing the Brownfields Act, however, Ashley's argument goes too far.

In particular, Ashley fails to provide a persuasive rationale for requiring a lower level of "care" from a BFPP under § 9607(r)(1), than from an "innocent landowner" under § 9607(b)(3). Both the BFPP exemption and the innocent landowner defense require a demonstration of "reasonable steps." *Compare* 42 U.S.C. § 9601(35)(B)(i)(II), *with id.* § 9601(40)(D). Logic seems to suggest that the standard of "appropriate care" required of a BFPP, who by definition knew of the presence of hazardous substances at a facility, should be *higher* than the standard of "due care" required of an innocent landowner, who by definition "did not know and had no reason to know" of the presence of hazardous substances when it acquired a facility. *Compare id.* §§ 9601(40)(D), 9607(r)(1) (BFPP exemption and "appropriate care" standard), *with id.* §§ 9601(35), 9607(b)(3) (innocent landowner defense and "due care" standard).

We need not here determine whether the BFPP standard of "appropriate care" actually is higher than the standard of "due care" mandated elsewhere in CERCLA, because in all events "appropriate care" under § 9601(40)(D) is at least as stringent as "due care" under § 9607(b)(3). *Accord* Office of Enforcement & Compliance Assurance, U.S. Envtl. Prot. Agency, Interim Guidance Regarding Criteria Landowners Must Meet in Order to Qualify for Bona Fide Prospective Purchaser, Contiguous Property Owner, or Innocent Landowner Limitations on CERCLA Liability 9 (March 6, 2003) (stating that reasonable steps required under the "appropriate care" standard establish "an approach that is consonant with traditional common law principles and the existing CERCLA 'due care' requirement").

We therefore borrow standards from CERCLA's "due care" jurisprudence to inform our determination of what "reasonable steps" must be taken to demonstrate "appropriate care."

We agree with the Second Circuit that the "due care" inquiry asks whether a party "took all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken in light of all relevant facts and circumstances." *New York v. Lashins Arcade Co.*, 91 F.3d 353, 361 (2d Cir. 1996) (internal quotation marks omitted). Under this standard, Ashley's inactions clearly show that it failed to exercise "appropriate care." For Ashley's delay in filling the sumps—which even Ashley's expert admitted should have been filled a full year before Ashley did so—demonstrates that it did not take the "reasonable steps to . . . prevent any threatened future release," 42 U.S.C. § 9601(40)(D), that "a similarly situated reasonable and prudent person would have taken," *Lashins Arcade Co.*, 91 F.3d at 361 (internal quotation marks omitted).

Accordingly, the district court did not err in finding that Ashley failed to demonstrate that it exercised "appropriate care" at the site. Because a party must establish all eight factors under 42 U.S.C. § 9601(40) to qualify for a BFPP exemption from liability, this failure mandates denial of Ashley's claim to BFPP exemption and affirmance of the district court's holding that Ashley is a PRP for the site as a current owner under § 9607(a)(1).

## III.

PCS and RHCE challenge the district court's denial of apportionment of harm at the site.**[8]** Both argue that the harm at the site is divisible and thus should be apportioned. We

---

**[8]**We note that some courts have held that apportionment is not available to parties, like RHCE, sued under § 9613(f), because apportionment is a defense to joint and several liability, and § 9613 imposes only several liability. *See Redwing Carriers*, 94 F.3d at 1513. Because no party raises this argument and RCHE's apportionment claim fails on the merits, we need not decide the issue and assume, for purposes of this case, that RHCE may argue for apportionment to avoid the court's equitable allocation of harms under § 9613(f).

review a district court's determination of whether a harm is capable of apportionment de novo, and review the factual findings underlying such a determination for clear error. *See In re Bell Petroleum Servs., Inc.*, 3 F.3d 889, 902 (5th Cir. 1993).

### A.

"While CERCLA does not mandate the imposition of joint and several liability, it permits it in cases of indivisible harm." *Monsanto*, 858 F.2d at 171. The Supreme Court has confirmed that "[t]he universal starting point for divisibility of harm analyses in CERCLA cases is § 433A of the Restatement (Second) of Torts." *Burlington Northern*, 556 U.S. at 614 (internal quotation marks omitted); *see also Monsanto*, 858 F.2d at 172.

"Under the Restatement, when two or more persons acting independently caus[e] a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused. . . . But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm." *Burlington Northern*, 556 U.S. at 614 (internal quotation marks and citations omitted); *see Monsanto*, 858 F.2d at 171-72. Thus, PRPs can avoid joint and several liability by establishing either that on-site harms are distinct, or that there exists "a reasonable basis for apportioning liability" for a single harm "among responsible parties." *Monsanto*, 858 F.2d at 172 (citing *Restatement (Second) of Torts* § 433B (1965)).

By its nature, apportionment necessarily requires a fact-intensive, site-specific analysis. *See United States v. NCR Corp.*, 688 F.3d 833, 841-42 (7th Cir. 2012); *Bell Petroleum Servs.*, 3 F.3d at 895-96; *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 269 (3d Cir. 1992). "Not all harms are capable of apportionment, . . . and CERCLA defendants seek-

ing to avoid joint and several liability bear the burden of proving that a reasonable basis for apportionment exists." *Burlington Northern*, 556 U.S. at 614.

For this reason, CERCLA's joint and several liability scheme may be "terribly unfair in certain instances." *Bell Petroleum Servs.*, 3 F.3d at 897. Nonetheless, "[e]quitable considerations play no role in the apportionment analysis," *Burlington Northern*, 556 U.S. at 615 n.9, because the availability of contribution actions under 42 U.S.C. § 9613(f) mitigates any inequity arising from the unavailability of apportionment, *see Axel Johnson*, 191 F.3d at 415.

## B.

The district court found that two factors contributed to the harm at the site—the amount of hazardous substances each PRP caused to be contributed to the site, and the amount of soil each PRP caused to be contaminated through secondary disposals. The court thus recognized that the harm at the site was at least "theoretically divisible" if a defendant provided sufficient evidence to establish a reasonable basis for apportionment based on those two factors.

At trial, PCS offered several bases for apportionment, including (1) the amount of fill material each PRP added to the site; (2) the volume of contaminants Planters and Old CNC introduced to the site; (3) the period of time that Planters and Old CNC produced fertilizers on the site; (4) the percentage of soils each PRP first disturbed on the site; and (5) the number of contaminated soil samples attributable to each PRP. According to PCS, these bases produced consistent results demonstrating PCS was responsible for, at most, six percent of the harm at the site.

The district court rejected PCS's proposed bases for apportionment. In doing so, the court identified several flaws systemic to PCS's proposed bases for apportionment. Most

notably, the court found PCS's methods did not (1) provide a reasonable estimate of the volume of soil contaminated by secondary disposals; (2) account for the likelihood of contamination prior to 1906, and thus assumed that Planters was responsible for all contamination prior to 1945; or (3) compensate appropriately for changes in the type and intensity of uses and construction on the site over time.

## C.

### 1.

On appeal, PCS first argues that the district court erred in requiring the establishment of more than a "reasonable basis" for apportionment, in contravention of the standard applied by the Supreme Court in *Burlington Northern*. (RHCE adopts PCS's argument on this point.) In *Burlington Northern*, the district court *sua sponte* apportioned the collective harm that two railroad companies caused at a facility by multiplying three factors: (1) the percentage of the total area of the facility the railroads owned; (2) the percentage of time the railroads leased their parcel to the facility operator; and (3) an estimate of the percentage of contamination at the facility attributable to the types of hazardous substances present on the railroads' parcel. The court then adjusted its calculation by adding a fifty-percent margin of error, and apportioned nine percent of the harm at the facility to the railroads. 556 U.S. at 616-18. After the Ninth Circuit reversed, concluding that these factors provided an unreliable measure of harm, the Supreme Court reversed the Ninth Circuit, and upheld the apportionment. The Supreme Court explained that the record before the district court provided a "reasonable basis" for the methodology it had adopted. *See id.* at 617-18.

Contrary to PCS's assertion, the district court's denial of apportionment here is entirely consistent with *Burlington Northern*. To be sure, *Burlington Northern* demonstrates that a "reasonable basis for apportionment" need not be mathemat-

ically precise, and may be based on the "simplest of considerations," *e.g.*, time and land area. *See* 556 U.S. at 617-18; *see also NCR Corp.*, 688 F.3d at 842. However, *Burlington Northern* neither mandates these "simplest of considerations," nor establishes their presumptive propriety in every case. *See NCR Corp.*, 688 F.3d at 842. For the factual scenario in *Burlington Northern* was relatively simple: "the primary pollution at the [site] was contained in an unlined sump and an unlined pond in the southeastern portion of the facility most distant from the Railroads' parcel and . . . the spills of hazardous chemicals that occurred on the Railroad parcel contributed to no more than 10% of the total site contamination." *Burlington Northern*, 556 U.S. at 617. Only "[w]ith those background facts in mind" did the Court conclude that the district court's methodology was reasonable. *Id.* at 617-18. Clearly, after *Burlington Northern*, apportionment necessarily remains a fact-intensive, site-specific determination. *See NCR Corp.*, 688 F.3d at 841-42.

Here the district court undertook precisely such a fact-intensive, site-specific determination. Weighing the facts in this case, the court held that any reasonable basis for apportionment must include reliable evidence as to *both* the initial disposals of hazardous substances *and* any secondary disposals that occurred over time. Indeed, the court distinguished *Burlington Northern* on this ground, emphasizing that in *Burlington Northern* most of the hazardous substances were located in unlined sumps and ponds, and that no evidence indicated that secondary disposals significantly contributed to the harm. The court further found that PCS's apportionment methodologies individually and collectively failed to provide the evidence as to secondary disposals necessary to "establish a reasonable basis for apportioning the harm at the Site." Denying apportionment because a party fails to provide reliable evidence as to one of the factors informing apportionment is in no way at odds with *Burlington Northern*.

Indeed, as *Burlington Northern* confirmed, in the face of uncertain causation of harm, "'courts have refused to make an

arbitrary apportionment for its own sake.'" 556 U.S. at 614-15 (quoting *Restatement (Second) of Torts* § 433A cmt. i (1963-64)). An arbitrary apportionment is just what the district court refused to make, as any apportionment without adequate evidence as to the harm caused by secondary disposals necessarily would have been arbitrary. Therefore, the district court's fact-intensive and site-specific analysis underlying its denial of apportionment entirely accords with *Burlington Northern*.

2.

PCS and RHCE next argue that, even if the district court's apportionment analysis was consistent with *Burlington Northern*, the court erred in holding that they failed to establish a reasonable basis for apportionment. Although the court found that all of the proposed methods of apportionment improperly assumed Planters' responsibility for all harm at the site prior to 1945, PCS and RHCE each maintain that they established a reasonable basis for apportioning at least *their individual shares* of the harm. Because PCS and RHCE are PRPs under different CERCLA provisions, we consider their arguments on this point separately.

a.

PCS's assertion of individual share apportionment presents the question of whether an owner or operator at the time of disposal under § 9607(a)(2) must provide a reasonable basis to apportion *all* of the harm, or only *its share* of the harm, to avoid joint and several liability.

Neither we nor the Supreme Court has ever before considered the question. Contrary to PCS's suggestion, *Burlington Northern* provides no guidance. The district court there apportioned *all* of the harm, because, in that case, all harm not caused by the railroads was necessarily caused by the long-time operator of the facility. *See Burlington Northern*, 556 U.S. at 606.

Nor do traditional and evolving standards of common law provide clear guidance on the issue. *Compare Restatement (Second) of Torts* § 433A(1)(b) (suggesting apportionment is appropriate only when a defendant can demonstrate that "there is a reasonable basis for determining the contribution of *each cause* to a single harm" (emphasis added)), *with United States v. Rohm & Haas Co.*, 2 F.3d 1265, 1280 (3d Cir. 1993) (holding apportionment required a showing "that there is a way to determine what portion of the 'harm' . . . is fairly attributable to [the defendant], as opposed to other responsible parties."), *overruled on other grounds by United States v. E.I. Dupont De Nemours & Co.*, 432 F.3d 161 (3d Cir. 2005); *Chem-Nuclear Sys., Inc. v. Bush*, 292 F.3d 254, 259-60 (D.C. Cir. 2002) (holding that a PRP can avoid joint and several liability by proving "the amount of the harm that it caused" (internal quotation marks omitted)).

However, we ultimately need not decide today whether a PRP under § 9607(a)(2) can avoid joint and several liability by apportioning only its own harm. For, even assuming that a PRP could do so, the district court did not err in holding that PCS failed to establish a reasonable basis for apportioning *its own* harm in this case. Both primary disposals (from fertilizer manufacturing) and secondary disposals (from earth-moving and construction) occurred during Old CNC's ownership and operation of the site. Therefore, even to establish its own share of the harm, PCS (Old CNC's successor) needed to provide an apportionment methodology that addressed both types of disposals. Because it did not do so, PCS failed to provide a "reasonable basis for apportionment" of its own harm (let alone all of the harm), and we affirm the district court's denial of apportionment. *See Chem-Nuclear Sys.*, 292 F.3d at 260 (finding defendant failed to prove its own share of the harm); *Rohm & Haas Co.*, 2 F.3d at 1280 (same).

b.

RHCE contends that, as a current operator PRP under § 9607(a)(1), it can avoid joint and several liability by demon-

strating that no disposal of hazardous substances has occurred during its operation of the facility, and thus a reasonable basis exists to apportion it a zero-share of the harm. This argument clearly fails.

The structure and purposes of CERCLA simply do not permit current owner or operator PRPs to use individual share apportionment to apportion themselves a zero-share harm.[9] Section 9607(a)(1) renders current owners and operators strictly liable for response costs regardless of their culpability. 42 U.S.C. § 9607(a)(1); *Trinity Am. Corp. v. U.S. Envtl. Prot. Agency*, 150 F.3d 389, 395 (4th Cir. 1998). "Innocent" current owners and operators seeking to avoid CERCLA's strict liability scheme must meet the requirements necessary to claim the narrow defenses and exemptions specifically established by Congress. *E.g.*, 42 U.S.C. § 9607(b); *see Trinity Am. Corp*, 150 F.3d at 395-96.

Allowing current owner and operator PRPs to avoid joint and several liability through a zero-share apportionment because no disposal occurred during their ownership or operation of a facility effectively would render current owner or operator liability coterminous with liability based on ownership or operation at the time of disposal. *Compare* 42 U.S.C. § 9607(a)(1) (establishing liability for current owners and operators, regardless of whether disposal occurred during ownership or operation), *with id.* § 9607(a)(2) (requiring disposal during ownership or operation for liability).

Such a rule would frustrate the several narrow statutory defenses and exemptions Congress created to address truly

---

[9]That the district court held RHCE was also a PRP as an operator at the time of disposal under § 9607(a)(2) does not affect this conclusion. It would defeat the purposes of CERCLA to permit a current operator PRP, who was also an operator at the time of disposal, to claim individual share apportionment, while *denying* this right to a current operator PRP who was *not* a PRP at the time of disposal.

"innocent" landowners. *See, e.g.*, *id.* § 9601(20)(D), 35(A) (involuntary acquisition exemption); *id.* §§ 9601(35), 9607(b)(3) (defense for innocent landowners); *id.* §§ 9601(40), 9607(r) (bona fide prospective purchaser exemption); *id.* § 9607(q) (contiguous property owner exemption). All of these provisions require much more than a mere showing that no disposal occurred during a current owner or operator's tenure at a facility. *See, e.g.*, *id.* §§ 9601(35), 9607(b)(3). Consequently, allowing such PRPs to apportion solely their own zero-share of liability would render the heightened requirements of these narrow defenses and exemptions dead letters. Where possible, we must interpret a statute to avoid rendering any of its provisions superfluous. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991). Our holding today avoids such redundancy, and preserves Congress' calculated balance of broad strict liability and narrow defenses and exemptions under CERCLA.

IV.

Having affirmed the district court's holding that the harm at the site is not subject to apportionment, we finally consider the several appeals of the court's ultimate allocation of liabilities under 42 U.S.C. § 9613(f). The district court equitably allocated liability for the response costs to the PRPs as follows: forty-five percent to Ross; thirty percent to PCS; sixteen percent to Holcombe and Fair; five percent to Ashley; three percent to Allwaste; one percent to RHCE; and zero percent to the City of Charleston. As the party bringing the § 9613(f) action, PCS bears the burden of proving each party's equitable share of response costs. *Minyard Enters.*, 184 F.3d at 385.

Section 9613(f) allows "[a]ny person [to] seek contribution from any other person who is liable or potentially liable under section 9607(a) . . . during or following any civil action . . . under section 9607(a)." A court "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). This

plain language grants a court significant discretion to choose which factors to consider in determining equitable allocation of liability. We review a district court's choice of factors for abuse of discretion, and its ultimate allocations of liability for clear error. *See Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000).

In this case, the parties do not challenge the court's selection of relevant factors in arriving at the appropriate allocation. They only challenge the court's application of those factors. PCS, RHCE, and Holcombe and Fair each contend that the court clearly erred by allocating too much liability to each of them, and not enough to the other parties.[10]

Considering, as we must, the record as a whole, we cannot conclude the district court clearly erred. The court's ultimate allocation of liability reasonably weighs relevant factors, including the degree of involvement each party had in disposals (both primary and secondary) on the site, the degree of care each party exhibited with respect to hazardous substances, the degree to which each party cooperated with government officials with respect to hazardous substances, and the benefit each party reaped from disposals of hazardous substances on the site. Although the record also might have supported a different allocation, the ultimate "allocation [is] among the reasonable conclusions supported by the evidence." *Boeing*, 207 F.3d at 1188. We therefore affirm the district court's allocation of liabilities under § 9613(f).[11]

---

[10]We reject Holcombe and Fair's alternative argument that we remand for further factual findings because the district court's analysis assertedly lacked the detail and exactness required for adequate appellate review. *See* Fed. R. Civ. P. 52(a). The district court made over two hundred factual findings, and specifically referenced the findings it considered important in its allocation determination for each PRP. This factual analysis adequately satisfies Rule 52(a).

[11]Ross challenges the district court's judgment directing that Ashley recover from PCS $147,617.02 plus interest, and that PCS recover from

V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

---

Ross $87,404.82 plus interest. Ross contends that the money judgment against it is premature because PCS, as the jointly and severally liable party under 42 U.S.C. § 9607(a), has not yet paid its proportionate share of allocated liability to Ashley. However, the court's order denying modification of the money judgment explicitly recognized that PCS cannot recover from Ross until it has paid more than its proportionate share to Ashley. Considering the court's clarification on the record, we find no error in the form of the money judgment.