**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL, *Plaintiff-Appellant*, <br><br> v. <br><br> WESTSIDE DELIVERY, LLC; and DOES 1 through 10, inclusive, *Defendants-Appellees.* | No. 16-56558 <br><br> D.C. No. 2:15-cv-07786-SVW-JPR <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted March 8, 2018
Pasadena, California

Filed April 27, 2018

Before: Susan P. Graber, William A. Fletcher,
and John B. Owens, Circuit Judges.

Opinion by Judge Graber

## SUMMARY[*]

### Environmental Law

The panel reversed the district court's summary judgment in favor of the defendant in an action under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.

The panel held that the defendant, a purchaser of real property at a tax sale, was not entitled to CERCLA's third-party defense to liability for cleanup costs. The panel concluded that the defendant had a "contractual relationship" with the pre-tax-sale owner of the property. In addition, the previous owner caused contamination "in connection with" its contractual relationship with the defendant. The panel remanded the case for further proceedings.

### COUNSEL

James R. Potter (argued) and Brian J. Bilford, Deputy Attorneys General; Sarah E. Morrison, Supervising Deputy Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Los Angeles, California; for Plaintiff-Appellant.

Emily L. Murray (argued) and Tim C. Hsu, Allen Matkins Leck Gamble Mallory & Natsis LLP, Los Angeles, California, for Defendants-Appellees.

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

GRABER, Circuit Judge:

This case presents a question of first impression in this circuit concerning the reach of the third-party defense in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"): Does a defendant who buys real property at a tax sale have a "contractual relationship" with the previous owner of the property within the meaning of CERCLA? We conclude that it does. Because we also conclude that the previous owner caused contamination "in connection with" its contractual relationship with Defendant Westside Delivery, LLC, we hold that Defendant is not entitled to CERCLA's third-party defense. We therefore reverse the district court's grant of summary judgment to Defendant and remand the case for further proceedings.

**FACTUAL AND PROCEDURAL HISTORY[1]**

From 1949 to 1990, the Davis Chemical Company recycled spent solvents at its facility in Los Angeles, California. One of the company's owners, Ernest A. Davis, owned the property at which the facility was located (the "Davis Chemical Site" or "Site"). In 1986, he conveyed the property to the Ernest A. Davis Separate Property Trust by

---

[1] Because we are reviewing a summary judgment, we view the facts in the light most favorable to the non-moving party, which is Plaintiff. *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1105 (9th Cir. 2016). But here, the historical facts are undisputed.

quitclaim deed. Following Mr. Davis' death, the property passed to the Davis Family Trust.**[2]**

In October 1990, Plaintiff, the California Department of Toxic Substances Control, ordered Davis to cease and desist all hazardous-waste-related activities. In 1992, the United States Environmental Protection Agency ("EPA") conducted a preliminary assessment of the Davis Chemical Site and noted that there was "significant spillage." The EPA referred the Site to Plaintiff for further investigation and remediation. A 1996 study conducted by a group of environmental consultants revealed that the soil at the Site contained elevated levels of several hazardous substances. Plaintiff then investigated further and identified former customers of Davis who might be liable for cleanup costs under CERCLA and state law. In 2002, Plaintiff reached an agreement with several of Davis' former customers, requiring those customers to devise a plan to clean up the Site. Plaintiff approved the plan in 2008.

For reasons that are not readily apparent from the record, the plan was not put into effect in 2008. Instead, Plaintiff sought out additional parties that might be responsible for shouldering the cost of cleanup. However, those parties were either unable to pay or had viable legal defenses, forcing Plaintiff to seek out alternative funding for the cleanup effort.

---

**[2]** If Defendant has a "contractual relationship" with the Davis Family Trust, which owned the Davis Chemical Site immediately before Defendant's tax-sale purchase, then Defendant has a "contractual relationship" with all the Davis entities. For that reason, the Davis Chemical Company, Ernest A. Davis, the Ernest A. Davis Separate Property Trust, and the Davis Family Trust are, for purposes of this case, one entity. We refer to that entity as "Davis."

In the meantime, Davis had failed to pay property taxes on the Site, prompting the Los Angeles County Tax Collector to sell the Site at a tax auction in 2009. The Site was not on the list of "Potentially Contaminated Parcels" included in the auction materials, but the list itself noted that it was not exhaustive, and the auction materials warned bidders that the onus was on them to investigate the properties. In August 2009, at the auction, Defendant submitted the highest bid on the Davis Chemical Site. On September 17, 2009, the Tax Collector executed a tax deed to Defendant, conveying title to the Site. Since purchasing the Site, Defendant has not conducted any operations there.

From 2010 through 2015, Plaintiff conducted cleanup efforts at the Site. After finishing the cleanup, Plaintiff sued Defendant under CERCLA, seeking to recover its cleanup expenses. Defendant asserted CERCLA's third-party defense, arguing that it was not liable because the release of hazardous substances at the Site was caused solely by third parties (including Davis) with whom it lacked a "contractual relationship" within the meaning of the statute. The district court agreed with that argument and granted summary judgment to Defendant. Plaintiff timely appealed.

**STANDARD AND SCOPE OF REVIEW**

We review de novo the district court's grant of summary judgment and the district court's interpretation of CERCLA. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 870 (9th Cir. 2001) (en banc).

Our review of a district court's grant of summary judgment is ordinarily limited to "the record presented to the district court at the time [it granted] summary judgment."

*Taylor AG Indus. v. Pure-Gro*, 54 F.3d 555, 558–59 (9th Cir. 1995). Here, however, because we granted several requests for judicial notice, we consider the materials submitted by the parties in connection with those requests as well as the record before the district court. *Lowry v. Barnhart*, 329 F.3d 1019, 1024–25 (9th Cir. 2003).

## DISCUSSION

Before answering the question whether the purchaser of real property at a tax sale has a "contractual relationship" with the previous private owner of the property within the meaning of CERCLA, we will briefly sketch the outlines of CERCLA and of California's tax-sale system. We also will discuss the role that state law plays in our analysis. We then will address the "contractual relationship" question and the related issue of whether Davis' acts leading to contamination of the Site occurred "in connection with" its contractual relationship with Defendant.

### A. *Background*

### 1. *CERCLA (1980)*

"In 1980, Congress enacted [CERCLA] in response to the serious environmental and health risks posed by industrial pollution." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (citation omitted). Unlike the Clean Air Act or the Clean Water Act, CERCLA is not a forward-looking regulatory statute that governs regulated entities' polluting activities. Rather, "CERCLA looks backward in time and imposes wide-ranging liability" on parties who are in some way responsible for contaminating a

facility.**[3]** *Marsh v. Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007). Relevant to this case, CERCLA allows a state that has responded to a "release" or "threatened release"**[4]** of hazardous substances at a facility to recoup its response costs from the owner of that facility, even if the owner had nothing to do with placing the hazardous substances at the facility. *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956–57 (9th Cir. 2013). What matters is that the state responded to a release or threatened release at a time when the defendant-owner owned the facility. *Cal. Dep't of Toxic Substances Control v. Hearthside Residential Corp.*, 613 F.3d 910, 911 (9th Cir. 2010).

CERCLA originally provided three affirmative defenses that otherwise-liable parties could assert to escape liability. The defense relevant to this case is the third-party defense:

> There shall be no liability . . . for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> . . . .

---

**[3]** "Facility" is defined to include "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9)(B).

**[4]** "The term 'release' means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ." *Id.* § 9601(22).

(3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant (except where the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail), if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions[.]

42 U.S.C. § 9607(b)(3).

## 2.  *SARA (1986)*

In 1986, Congress passed the Superfund Amendments and Reauthorization Act ("SARA"), Pub. L. No. 99-499, 100 Stat. 1613 (1986).  SARA was "aimed at speeding cleanup and forcing quicker action by the EPA."  *Carson Harbor Vill.*, 270 F.3d at 887.  SARA added a new type of third-party defense known as the innocent-landowner defense.[5]  *Id.*

---

[5] The parties spar over the relationship between the third-party and innocent-landowner defenses, with Defendant arguing that they are "separate and distinct" defenses, and Plaintiff arguing that "the distinction

Congress added that defense in an odd way: it defined the previously undefined phrase "contractual relationship"—a phrase key to the applicability of the third-party defense—and then set out certain circumstances in which that definition would not be met. *Id.* The innocent-landowner defense provides as follows:

> The term "contractual relationship," for the purpose of section 9607(b)(3) . . . , includes, but is not limited to, land contracts, deeds, easements, leases, or other instruments transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:

> (i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.

> (ii) The defendant is a government entity which acquired the facility by escheat, or

---

between the two is not so clear." We conceive of the innocent-landowner defense as a flavor of third-party defense—it relies on the text of the "traditional" third-party defense and incorporates some of the requirements of that defense, but also includes additional criteria.

through any other involuntary transfer or acquisition, or through the exercise of eminent domain authority by purchase or condemnation.

(iii) The defendant acquired the facility by inheritance or bequest.

In addition to establishing the foregoing, the defendant must establish that the defendant has satisfied the requirements of section 9607(b)(3)(a) and (b) of this title, [and must also meet several other conditions].

42 U.S.C. § 9601(35)(A).[6] Note that the innocent-landowner defense is available to a private purchaser of land *only* if that purchaser did not have actual or constructive knowledge of contamination at the time of purchase.[7]

Before SARA, there was some confusion as to whether the third-party defense could be asserted with respect to pre-existing contamination—that is, whether a "third party" was

---

[6] This text is § 9601(35)(A) as it exists today. None of the changes made since SARA was passed in 1986 is relevant to our analysis. Defendant does not contend that it qualifies for the innocent-landowner defense.

[7] In 2002, Congress added the "bona fide prospective purchaser" defense to CERCLA. Small Business Liability Relief and Brownfields Revitalization Act, Pub. L. No. 107-118, § 222, 115 Stat. 2356, 2370–72 (2002) (codified at 42 U.S.C. §§ 9601(40), 9607(r)). That defense, unlike the innocent-landowner defense, protects purchasers who knowingly buy contaminated property. *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 179–80 (4th Cir. 2013). Defendant does not contend that it qualifies for the bona fide prospective purchaser defense.

necessarily someone whose acts or omissions occurred *after* a defendant acquired property. *See New York v. Shore Realty Corp.*, 759 F.2d 1032, 1048 (2d Cir. 1985) ("It is doubtful that a prior owner could be [a third party] . . . since the acts or omissions referred to in the statute are doubtless those occurring during the ownership or operation of the defendant."). SARA "clarified" that a previous owner or other entity whose acts or omissions occurred in the past can be a third party. *Carson Harbor Vill.*, 270 F.3d at 887.

The fact that a previous owner may be a third party makes the word "indirectly" in § 9607(b)(3) very important. If the owner who immediately preceded defendant *A*—say, *B*—has a "direct" contractual relationship with *A*, and the owner before that—say, *C*—has a direct contractual relationship with *B*, then *A* has an "indirect" contractual relationship with *C*. *See Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 755, 758 (5th Cir. 2011) (describing a "contractual relationship . . . involving a chain of intermediaries" as "an indirect" contractual relationship within the meaning of the Oil Pollution Act, which contains "a third-party defense provision virtually identical to" CERCLA's). The same logic leads to the conclusion that a defendant-landowner has a contractual relationship with *all* previous landowners—or, at least, all previous landowners in the chain of title—unless the defendant-landowner can qualify for the innocent-landowner defense. *See United States v. CDMG Realty Co.*, 96 F.3d 706, 716 (3d Cir. 1996) (noting that "[t]he [third-party] defense is generally not available if the third party causing the release is in the chain of title with the defendant" unless "the person claiming the defense is an 'innocent owner'").

### 3. *California's Tax-Sale System*

If the owner of non-exempt real property in California fails to pay property taxes, "a default is declared" and the property becomes "[t]ax-defaulted property." *Carloss v. County of Alameda*, 194 Cal. Rptr. 3d 784, 791 (Ct. App. 2015); *see also* Cal. Rev. & Tax. Code §§ 126, 3436. After some period of time, "the tax collector shall have the power to sell and shall attempt to sell . . . all or any portion of tax-defaulted property that has not been redeemed." Cal. Rev. & Tax. Code § 3691(a)(1)(A). Under the current system, "tax-defaulted property is sold directly to a private party at auction." *Carloss*, 194 Cal. Rptr. 3d at 794.

Once the property is sold, the tax collector executes a deed to the tax-sale purchaser. Cal. Rev. & Tax. Code § 3708. The deed conveys to the tax-sale purchaser "a *better title* than might otherwise be conveyed." *Quelimane Co. v. Stewart Title Guar. Co.*, 960 P.2d 513, 528 (Cal. 1998). That is because "a title granted by a tax deed pursuant to a valid sale of the property for nonpayment of taxes, conveys not merely the title of the person assessed, but a new and complete title under an independent grant from the state." *Helvey v. Sax*, 237 P.2d 269, 271 (Cal. 1951). In California, as in other states, the government derives its ability to provide a tax-sale purchaser with a "fresh" title from its sovereign authority to tax. *See id.* ("The state's taxing power is derived from its sovereign authority, not from any grant to it by the owner of property."); *Cal. Loan & Tr. Co. v. Weis*, 50 P. 697, 698 (Cal. 1897) ("The power of the legislature to make the lien of taxes paramount to all other liens upon the land, so that when sale is made the purchaser takes title freed from incumbrance, is not questioned.").

## B. *The Role of State Law*

Before deciding what "contractual relationship" means and whether Defendant and Davis have a "contractual relationship" by virtue of the tax deed, we must determine what role state law should play in our analysis. Of course, the meaning of "contractual relationship" is "necessarily a federal question in the sense that its construction remains subject to . . . supervision" by federal courts. *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 43 (1989). But "Congress sometimes intends that a statutory term be given content by the application of state law." *Id.* The "general assumption," though, is that, "in the absence of a plain indication to the contrary, Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Id.* (internal quotation marks and alteration omitted).[8]

Here, we do not think that there is a "plain indication" that Congress intended for state law to answer the question whether a particular type of instrument or transaction is a

---

[8] This is not a case in which we must decide how to fill a gap in a detailed federal statutory scheme. *See United States v. Gen. Battery Corp.*, 423 F.3d 294, 311 n.14 (3d Cir. 2005) (Rendell, J., concurring in part and dissenting in part) (explaining the distinction between cases in which courts confront statutory gaps and cases in which courts "constru[e] a word or phrase in [a] statute"). When we face such a gap, the presumption is that state law should provide the rule of decision; we fashion a uniform federal common law rule only in rare instances. *Atchison, Topeka, & Santa Fe Ry. Co. v. Brown & Bryant, Inc.*, 159 F.3d 358, 362–63 (9th Cir. 1998). But different considerations lead to the opposite presumption when the question is the meaning of a federal statutory term or phrase. *See, e.g.*, *NLRB v. Hearst Publ'ns, Inc.*, 322 U.S. 111, 120–24 (1944) (discussing the reasons for the presumption of a uniform federal definition of the term "employee" in the National Labor Relations Act).

"contractual relationship."   To be sure, the statutory definition refers to several instruments—such as deeds and easements—that are creatures of state property law.   But Congress defined "contractual relationship" broadly to include both a catch-all ("other instruments transferring title or possession") and a "not limited to" clause.   Those provisions suggest that Congress was trying to capture a certain kind of instrument reflecting a certain kind of relationship between a defendant and a purported third party, regardless of how state law might characterize that instrument or that relationship.  *See Morrow v. Scofield*, 116 F.2d 17, 19 (5th Cir. 1940) ("[W]e think the comprehensive language of the federal statute makes it quite plain that it was the intention of Congress to require the fixing of stamps to instruments of this kind, instruments which in substance convey interests in lands, tenements or other realty without regard to the particular legal effects and consequences which may be attached to them by the laws of a particular state.").

    There is a useful analogy to be drawn to tax and bankruptcy law—two areas in which Congress often attaches federal consequences to state-law-created property rights or transfers of rights.  In both areas, it is generally true that *state* law determines whether a person has a property right and what the nature of that right is.   But a *federal* standard governs the federal consequences of transferring that property right.  *See Barnhill v. Johnson*, 503 U.S. 393, 397–98 (1992) (noting that, although property rights are "creatures of state law," "'[w]hat constitutes a transfer [of property for bankruptcy purposes] and when it is complete' is a matter of federal law" (quoting *McKenzie v. Irving Tr. Co.*, 323 U.S. 365, 369–70 (1945))); *see also Burnet v. Harmel*, 287 U.S. 103, 110 (1932) ("The state law creates legal interests, but the federal statute determines when and how they shall be

taxed."). And when Congress uses broad wording to define the types of property interests or transfers to which it seeks to attach consequences, it evinces an intent to use a uniform federal standard that does not depend on the particulars of state property law. *See Britt v. Damson*, 334 F.2d 896, 901–02 (9th Cir. 1964) ("The question of whether a particular occurrence is a 'transfer' within the meaning of the [Bankruptcy] Act is a matter of federal characterization. Therefore in deciding whether the occurrence in question was a 'transfer' we are not concerned with what label [state] law has placed upon occurrences of this kind." (citation omitted)); *Morrow*, 116 F.2d at 19. So too here. State law determines what property interests, if any, Defendant and Davis possess or possessed in the Site; but whether the occurrences or transactions that created and destroyed those interests constitute a "contractual relationship" between Defendant and Davis does not turn on state law.

## C. *The Tax Deed Created a "Contractual Relationship" Between Defendant and Davis*

The key question in this case is whether Defendant and Davis have a "contractual relationship," direct or indirect, by virtue of the tax sale. It appears that, under the current California tax-sale system, the government never holds title to or acquires any possessory interest in tax-defaulted property sold to a private party at auction. *See Carloss*, 194 Cal. Rptr. 3d at 794 ("In 1984, tax default sale procedures were changed from the earlier practice of sales to the state to the current practice outlined above, in which tax-defaulted property is sold directly to a private party at auction."). But it is not entirely clear—one could conceive of a tax deed as reflecting two separate transactions: one in which the government acquires an interest from the tax-

defaulted owner and a second in which the government gives a new title to the tax-sale purchaser. Ultimately, we reach the same conclusion regardless of how we view a tax sale, so we analyze the question whether Defendant and Davis have a "contractual relationship" under both views.

### 1. *The One-Transaction View of a Tax Sale*

We begin with the text of the statutory definition of "contractual relationship." *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1658 (2017) ("[We] [s]tart, as we always do, with the statutory language . . . ."). As noted earlier, the definition contains both an "includes, but is not limited to" clause and a "catch-all" clause. Taken together, those clauses suggest that the phrase "contractual relationship" should be construed broadly. *See San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1229 (9th Cir. 2017) ("The 'including, but not limited to,' language . . . indicates Congress's intent to provide a broad . . . directive."); *see also Fed. Mar. Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 734 (1973) (noting that catch-all "clauses are to be read as bringing within a statute categories similar in type to those specifically enumerated"). Indeed, those clauses, when read in light of the specific examples listed in the statute, suggest that Congress intended to capture *any* instrument reflecting a voluntary transaction resulting in a change of ownership or possession.

But the scope of "contractual relationship" is even broader than that, as evidenced by the exception in § 9601(35)(A)(ii). That exception necessarily implies that the transactions and instruments described therein—acquisition by a government entity through "escheat, or through any other involuntary transfer or acquisition, or through the

exercise of eminent domain authority"—would otherwise create "contractual relationships." *See, e.g.*, *Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267, 272 (3d Cir. 1984) ("[T]he fact that Congress created an exception to the automatic stay for certain actions by governmental units itself implies that such units are otherwise affected by the stay."). Applying that reasoning, even *involuntary* transfers can be transfers of title or possession within the meaning of the statute, and a "contractual relationship" can form even when property is transferred without the consent of both parties.[9]

Keeping in mind that the definition of "contractual relationship" should be construed broadly and that it includes involuntary transfers, we think that a tax deed fits comfortably within the definition as an "instrument[] transferring . . . possession" from Davis to Defendant. 42 U.S.C. § 9601(35)(A). Before the execution of the tax deed, Davis had the legal right to possess the Davis Chemical Site. The tax deed divested Davis of its interest and vested the right to possession in Defendant. That is the definition of a "transfer" in the law of property. *See* Restatement (First) of Property § 13 (Am. Law Inst. 1936) ("The word 'transfer,' as it is used in this Restatement, when applied to interests in land . . . , means the extinguishment of such interests existing in one person and the creation of such interests in another person."). It does not matter that the tax collector effectuated the transfer—that fact only made the transfer involuntary from Davis' perspective, and involuntary transfers can create "contractual relationships."

---

[9] The exception in § 9601(35)(A)(iii)—which includes acquisition by inheritance or bequest—also supports the conclusion that involuntary transfers can create a "contractual relationship."

### 2. *The Two-Transaction View of a Tax Sale*

If we view a successful tax sale as a two-transaction procedure, Defendant and Davis still have a "contractual relationship" through the tax deed, albeit a more indirect one. The tax deed from the government to Defendant obviously constitutes a direct "contractual relationship" between them. The harder question under the two-transaction view is whether the government and Davis have a "contractual relationship" through the government's acquisition of the Site from Davis.

Section 9601(35)(A)(ii) exempts from the definition of "contractual relationship" those transactions in which "[t]he defendant is a government entity which acquired the facility by escheat, or through any other involuntary transfer or acquisition, or through the exercise of eminent domain authority by purchase or condemnation."  As discussed above, that exception implies that the transactions and transfers described therein would otherwise create "contractual relationships."  But the exception applies only if the *defendant* is a government entity.

The question, then, is whether a government entity's acquisition of real property due to tax delinquency is an "involuntary transfer or acquisition" within the meaning of § 9601(35)(A)(ii).  We conclude that it is.  Section 9601(35)(A)(ii), read as a whole, is targeted at situations in which the government acquires property through methods that only the government can employ.  Construed that way, the government's acquisition of tax-defaulted property fits within the exception when the government is the defendant.  Moreover, § 9601(35)(A)(ii) was added to the statute at the

same time as § 9601(20)(D),[10] which exempts from the definition of "owner or operator" any "unit of State or local government which acquired ownership or control *involuntarily* through bankruptcy, *tax delinquency*, abandonment, or other circumstances in which the government *involuntarily* acquires title by virtue of its function as sovereign." (Emphases added.) Both § 9601(20)(D) and § 9601(35)(A)(ii) are aimed at providing protection to government entities that acquire contaminated property by means available only to the sovereign. *Hercules Inc. v. EPA*, 938 F.2d 276, 280–81 (D.C. Cir. 1991). That common purpose strongly suggests that acquisition through tax delinquency, which is an "involuntary acquisition" for purposes of § 9601(20)(D), also is an "involuntary acquisition" for purposes of § 9601(35)(A)(ii). *See Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (discussing the "presum[ption] that the same term has the same meaning when it occurs here and there in a single statute").

We note that the EPA likewise has construed "involuntary transfer or acquisition" in § 9601(35)(A)(ii) to have the same scope as § 9601(20)(D) and, therefore, to include an acquisition through tax delinquency. *See* 40 C.F.R.

---

[10] Congress recently amended § 9601(20)(D) in a rider to an appropriations act. *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. N, § 2, __ Stat. __ (to be codified at 42 U.S.C. § 9601(20)(D)). The amendment to § 9601(20)(D) does not change our analysis of the meaning of § 9601(35)(A), which Congress chose not to amend. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) ("When Congress amends one statutory provision but not another, it is presumed to have acted intentionally."); *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992) ("Congress . . . may amend substantive law in an appropriations statute, as long as it does so clearly.").

§ 300.1105(a) ("Governmental ownership or control of property by involuntary acquisitions or involuntary transfers within the meaning of [42 U.S.C. § 9601(20)(D)] *or* [§ 9601(35)(A)(ii)] includes, but is not limited to: (1) Acquisitions by or transfers to the government in its capacity as a sovereign, including transfers or acquisitions . . . *as the result of tax delinquency* . . ." (emphases added)).[11] The EPA concluded, after a careful analysis of CERCLA and SARA, that Congress' use of similar terms in § 9601(20)(D) and § 9601(35) evinced its intent "to refer to the same types of transfers or acquisitions" in the two sections.  National Oil and Hazardous Substances Pollution Contingency Plan; Lender Liability Under CERCLA, 57 Fed. Reg. 18,344, 18,380 (Apr. 29, 1992).[12]  Given the thoroughness of EPA's reasoning, we conclude that the agency's interpretation is due great respect. *See United States v. Mead Corp.*, 533 U.S. 218, 235 (2001) (holding that an agency's interpretation of a statute that it administers "may surely claim the merit of its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight," even if it does not qualify for *Chevron* deference).[13]

---

[11] Title 40 C.F.R. § 300.1105 was promulgated well before Congress' recent amendment to § 9601(20)(D).

[12] In *Kelley v. EPA*, 15 F.3d 1100, 1108 (D.C. Cir. 1994), the D.C. Circuit vacated the entire rule of which § 300.1105 was a part.  But Congress reinstated § 300.1105 in a rider to an appropriations bill. Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 2504, 110 Stat. 3009.

[13] We need not, and do not, decide whether the EPA's interpretation of § 9601(20)(D) and § 9601(35)(A)(ii) should be given deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), either because Congress itself reinstated the regulation or for

### 3. *Under Either View of a Tax Sale*

Our conclusion that a tax-sale purchaser such as Defendant has a "contractual relationship" with the pre-tax-sale private owner of tax-defaulted property is bolstered by an examination of the definition in the context of CERCLA as a whole. *See Carson Harbor Vill.*, 270 F.3d at 880 (explaining that "[n]o statutory provision is written in a vacuum" and that each provision of CERCLA must be read in light of the statute "as a whole, including its purpose and various provisions"); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (noting that the goal when construing a complex regulatory statute is to "interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole" (citations and internal quotation marks omitted)).

The definition of "contractual relationship" was added to CERCLA at the same time as the innocent-landowner defense. Indeed, it was *through* the definition that Congress added the innocent-landowner defense. "Congress intended the [innocent-landowner] defense to be very narrowly applicable, for fear that it might be subject to abuse." *Carson Harbor Vill.*, 270 F.3d at 883. A typical—that is, non-tax-sale—private purchaser who buys property contaminated by a previous owner or possessor is entitled to the innocent-landowner defense only if the purchaser bought the property without actual or constructive knowledge of contamination. 42 U.S.C. § 9601(35)(A)(i). That is, the purchaser must be "truly 'innocent.'" *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 185 (4th Cir. 2013). But

---

any other reason. We reach the same conclusion as the EPA even without the benefit of its guidance.

under Defendant's reading of the statute, a private purchaser of tax-defaulted property contaminated by a previous owner or possessor—who, if anything, should be *more* wary of pre-existing contamination than a typical land purchaser[14]—need not be "innocent" or unaware of the contamination to be relieved of liability. Defendant's reading thus creates, in effect, a loophole that frustrates the defense's purpose. To be sure, Congress often includes exceptions in statutes that serve to undermine broader statutory purposes; that is the natural result of a legislative process that involves compromise and difficult-to-reconcile policy preferences. When Congress does so, though, it tends to speak clearly. *See James v. City of Costa Mesa*, 700 F.3d 394, 403 (9th Cir. 2012) ("Congress could not have intended to create such a capacious loophole, especially through such an ambiguous provision."). It did not do so here. On the contrary, the breadth of the definition of "contractual relationship" implies that the Congress that enacted SARA intended the innocent-landowner defense to be the sole defense available to private purchasers of land contaminated by previous owners.

---

**14** Contaminated properties form a substantial fraction of tax-delinquent or tax-defaulted properties in many areas. *See* Grant R. Trigger et al., *Making Brownfields Green [Again]: How Efforts to Give Urban Centers an Economic Facelift Have Changed the Face of Environmental Policy*, 76 Mich. B.J. 42, 42 (1997) ("Detroit was an early selection for a brownfields pilot project because of its heavy industrial base and the estimate that some 45,000 contaminated sites have been abandoned and forfeited to the city due to unpaid taxes."); *see also* Matthew D. Fortney, Comment, *Devolving Control Over Mildly Contaminated Property: The Local Cleanup Program*, 100 Nw. U. L. Rev. 1863, 1903 (2006) ("Municipalities often gain title to brownfield property because of tax delinquency.").

Relatedly, we note that Defendant's reading of the statute would lead to anomalous results.  For example, consider the situation of a prospective purchaser who learns that there are tax liens on a contaminated property that he or she is interested in buying.  Under Defendant's view, the buyer is better off waiting until the owner defaults on the tax liens and the property goes through the tax-sale procedure than buying the property from the owner and risking CERCLA liability or complying with the many requirements of the bona fide prospective purchaser defense:  once the property has gone through the tax-sale procedure, the CERCLA liability is "scraped off" and the buyer is not responsible for clean-up costs.    Defendant can point to nothing in the statute suggesting that Congress intended to give such an enormous advantage to private tax-sale purchasers.  As the EPA stated, "there is no authority anywhere in CERCLA that would support the 'laundering' of liability" through a mechanism such as a tax sale.  57 Fed. Reg. at 18,372–73.

Given the breadth of the definition of "contractual relationship" and the stringent requirements that Congress set out for ensuring that only "truly 'innocent'" purchasers would be able to avoid liability, we think it likely that Congress intended for the innocent-landowner defense to be the *sole* defense available to a private purchaser of land contaminated by a previous owner or possessor.[15]  At the very least, we are confident that Congress did not mean to treat tax-sale purchasers differently from typical purchasers, which is why it defined "contractual relationship" broadly enough to include the relationship between a tax-sale purchaser and the pre-tax-sale owner of tax-defaulted property.

---

[15] The bona fide prospective purchaser defense is also available to such a purchaser, but that defense was not added to CERCLA until 2002.

Both the plain text of the definition of "contractual relationship" and its place in the statutory scheme convince us that a tax-sale buyer such as Defendant has a "contractual relationship" with the pre-tax-sale owner of that property.

### 4. *Defendant's Arguments*

Defendant makes several arguments as to why it lacks a "contractual relationship" with Davis. We find none of them persuasive.

First, Defendant argues that it cannot have a "contractual relationship" with Davis because it has never had a "relationship" of *any* kind with Davis, nor did it enter into "any agreement in furtherance of a common goal" with Davis. That argument would have some force if "contractual relationship" were undefined in the statute, in which case we would "endeavor to give th[e] [phrase] its ordinary meaning." *United States v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000). But Congress has defined "contractual relationship," so the ordinary meaning of the words "contractual" and "relationship" do not control. *See Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning.").

Next, Defendant argues that it lacks a "contractual relationship" with Davis because it received a "new" title through the tax deed. Phrased slightly differently, Defendant's argument is that it lacks a "contractual relationship" with Davis because Davis is not in its chain of

title.[16]  But, as noted, state law does not govern.  A break in
the chain of title is the kind of "particular legal effect[] and
consequence[] . . . attached to" a transaction by state law,
*Morrow*, 116 F.2d at 19, that has no bearing on whether that
transaction creates a "contractual relationship" for purposes
of § 9601(35)(A).[17]

Finally, Defendant argues that interpreting "contractual
relationship" to include the relationship between a tax-sale
purchaser and previous owners of the property would render
the "traditional" third-party defense "meaningless."  We
disagree.  The "traditional" third-party defense is available in
cases in which a defendant-owner's property is contaminated
by unrelated "third parties" *after* the defendant acquires the
property.[18]  It is also possible that the defense might be
available to a defendant that purchased property that was

---

[16] We assume, but need not decide, that Defendant is correct about the
effect of a tax sale on the chain of title under California law.

[17] We acknowledge that the one district court to have addressed the
question before us concluded that a tax-sale purchaser does not have a
"contractual relationship" with the previous owner of the property because
the tax sale results in a new title. *Cont'l Title Co. v. Peoples Gas Light &
Coke Co.*, No. 96 C 3257, 1999 WL 753933, at *2 (N.D. Ill. Sept. 15,
1999).  A 2006 "recommended decision" issued by an EPA Regional
Judicial Officer reached the same conclusion using similar reasoning. *See
Fla. Petroleum Reprocessors, Inc.* (EPA recommended decision June 29,
2006) (Schub, Regional Judicial Officer, Region 4) (following the
reasoning of *Cont'l Title*).  For the reasons given here, we do not find the
reasoning in either of those authorities persuasive.

[18] Indeed, in the early days of CERCLA, the Second Circuit suggested
that the third-party defense could be asserted *only* with respect to acts or
omissions occurring after the defendant's acquisition of property. *Shore
Realty Corp.*, 759 F.2d at 1048–49.

already contaminated if that contamination was caused solely by the acts of true "third parties"—vandals, "midnight dump[ers]," and the like.  Superfund Program; De Minimis Landowner Settlements, Prospective Purchaser Settlements, 54 Fed. Reg. 34,235-01, 34,239 (Aug. 18, 1989).

### D. *Relevant Polluting Activities Occurred "In Connection With" the Contractual Relationship Between Defendant and Davis*

The "traditional" third-party defense is unavailable to a defendant if the purported third party's polluting activities occurred "in connection with a contractual relationship, existing directly or indirectly, with the defendant." 42 U.S.C. § 9607(b)(3).  For the reasons discussed above, we hold that Defendant and Davis have a "contractual relationship." Defendant's final argument concerns the "in connection with" condition in § 9607(b)(3):  Defendant argues that it is entitled to the third-party defense because Davis' acts and omissions that contaminated the Site did not occur "in connection with" its contractual relationship with Defendant.  Defendant points to a line of Second Circuit cases in which that court held that, "[i]n order for [a] landowner to be barred from raising the third-party defense . . . , the contract between the landowner and the third party must either relate to . . . hazardous substances or allow the landowner to exert some element of control over the third party's activities."  *Westwood Pharm., Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 964 F.2d 85, 91–92 (2d Cir. 1992); *see also New York v. Lashins Arcade Co.*, 91 F.3d 353, 360 (2d Cir. 1996) (reaffirming the *Westwood* rule).

We begin by observing that "[t]he phrase 'in connection with' is essentially indeterminate because connections, like relations, stop nowhere.  So the phrase 'in connection with'

provides little guidance without a limiting principle consistent with the structure of the statute and its other provisions." *Maracich v. Spears*, 570 U.S. 48, 59–60 (2013) (citation, internal quotation marks, and brackets omitted). Reading the phrase "in connection with" in context, we conclude that it cannot have the meaning that Defendant proffers when a defendant seeks to avoid liability for contamination caused by a previous landowner or possessor. If the "in connection with" condition were construed so narrowly as to allow a defendant-purchaser to assert the third-party defense in all cases in which the relevant land contract, deed, or other instrument did not "relate to . . . hazardous substances," there would have been little need for Congress to add the innocent-landowner defense,[19] because most innocent purchasers would have been covered already by the "traditional" third-party defense. The innocent-landowner defense would be rendered largely superfluous. *See United States v. Domenic Lombardi Realty, Inc.*, 204 F. Supp. 2d 318, 332 (D.R.I. 2002) ("To adopt the interpretation [of "in connection with"] set forth . . . in *Westwood* would render the explicit language of the statutory definition [of "contractual relationship"] inoperative" in cases involving a defendant that purchased contaminated property.); *see also* Craig N. Johnston, *Current Landowner Liability Under CERCLA: Restoring the Need for Due Diligence*, 9 Fordham Envtl. L.J. 401, 462 (1998) ("The *Westwood* approach makes no sense . . . in the context of

---

[19] More precisely, there would have been little need for Congress to enact that portion of the innocent-landowner defense that applies to private purchasers. *See* 42 U.S.C. § 9601(35)(A)(i).

preexisting contamination.").[20] As we have noted in a similar context, it seems doubtful that, "even in the uncertain world of CERCLA, . . . Congress went to the trouble of amending the statute to create a defense that no one would need." *Carson Harbor Vill.*, 270 F.3d at 883.

However, we do not agree with Plaintiff that the "in connection with" condition is inapplicable in a case involving a defendant-owner seeking to avoid liability for contamination caused by previous owners or possessors.[21] Though Defendant's proposed "limiting principle" does not comport with CERCLA as a whole, it does not follow that there is *no* limiting principle that can constrain the reach of "in connection with" in a manner that is consistent with the statute. Our "duty to give effect, if possible, to every clause and word of a statute," *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 111 (2012) (internal quotation marks omitted),

---

[20] *Westwood* itself dealt with a third party whose polluting activities took place *after* the defendant had sold the property. 964 F.2d at 86–87. Perhaps the construction given to "in connection with" by the Second Circuit is appropriate in that context. But *Lashins Arcade*'s extension of *Westwood* to the context of pre-existing contamination is inconsistent with the innocent-landowner defense and CERCLA as a whole. *See* Johnston, *supra* at 463 (noting that "[t]he [*Lashins Arcade*] approach cannot be squared with . . . the statute"); *see also Lefebvre v. Cent. Me. Power Co.*, 7 F. Supp. 2d 64, 71 n.3 (D. Me. 1998) (rejecting *Lashins Arcade*); *Goe Eng'g Co. v. Physicians Formula Cosmetics, Inc.*, No. CV 94-3576-WDK, 1997 WL 889278, at *10 n.7 (C.D. Cal. June 4, 1997) (rejecting *Lashins Arcade* and *Westwood*).

[21] Plaintiff's precise argument is that "the 'in connection with' requirement cannot apply to defendants asserting the innocent purchaser form of the third-party defense." But the logic of Plaintiff's argument extends to cases such as this one in which a defendant asserts the "traditional" third-party defense in the context of contamination caused by previous owners or possessors.

requires us to look hard for a construction of "in connection with" that fits in with the statute before concluding that the phrase should be ignored.

In the context of a defendant-landowner asserting a defense against liability for a previous owner or possessor's acts or omissions, the "in connection with" condition is intended to filter out those situations in which the previous owner's polluting acts or omissions were unrelated to its status as a landowner. Imagine, for instance, that an owner, *A*, sold uncontaminated land to *B* and that, years after the sale, a truck owned by *A* happened to overturn near the land, causing contamination with hazardous pollutants. If *B* were to be sued under CERCLA, it could assert a third-party defense notwithstanding its contractual relationship with *A*, because the truck's turning over was in no way related to *A*'s status as the owner of the land—it occurred long after *A* had parted with its interest in the land, and it did not occur while *A* was using the land in its capacity as an owner.

Here, Davis' actions that led to the release of hazardous pollutants occurred while it owned the Site, and those actions occurred on the Site. Accordingly, the acts or omissions of Davis that caused the contamination occurred "in connection with" its contractual relationship with Defendant. For that reason, Defendant is not entitled to the third-party defense.

**REVERSED and REMANDED.**